## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:17CR104

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **LONNIE ARMACHAIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

     **THIS MATTER** is before the Court upon "Defendant's Motion to Suppress Statement" (#15). The Government filed "Government's Response to Defendant's Motion to Suppress Statement" (#23). The Defendant then filed "Defendant's Reply to Government's Response to Defendant's Motion to Suppress Statement" (#29). The Court conducted an evidentiary hearing on February 25, 2018, heard evidence from the Government and the Defendant, and heard arguments from counsel. Having carefully considered the evidence, briefs, and arguments of counsel, the Court enters the following Findings, Conclusions and Recommendation.

## FINDINGS AND CONCLUSIONS

### I.    Procedural Background

     On August 16, 2017, a grand jury in the Western District of North Carolina returned a six-count Bill of Indictment presenting criminal charges against Defendant (#1). On November 4, 2017, a six-count Superseding Bill of Indictment (#22) was returned by the grand jury, which charged Defendant with the following: engaging in

and attempting to engage in a sexual act, within the boundaries of the Eastern Band of Cherokee Indians Reservation and within the Western District of North Carolina and elsewhere, with someone who had not attained twelve (12) years of age, all in violation of Title 18, United States Code, Sections 2241(c) and 1153 (Counts One, Two and Three); and engaging in and causing sexual contact with someone who had not attained twelve (12) years of age, within the boundaries of the Eastern Band of Cherokee Indian Reservation and within the Western District of North Carolina and elsewhere, all in violation of Title 18, United States Code, Sections 2244(a)(5) and 1153 (Counts Four, Five and Six).

On October 27, 2017, Defendant filed the instant Motion to Suppress Statements (#15), in which he argues all his statements made during an interrogation that occurred on July 26, 2017, were made in violation of his Fifth Amendment rights and should be suppressed, or in the alternative, a hearing should be conducted. Id. at 17. On November 17, 2017, the Government filed a Response (#23). On December 1, 2017, Defendant filed a Reply (#29). Defendant's request for an evidentiary hearing was granted, and on February 20, 2018, the Court conducted an evidentiary hearing.

**II. THE EVIDENCE**

    **A.    The Interrogation of Defendant.**

Prior to the evidentiary hearing, there was presented to the Court, by agreement of the parties, a transcript entitled, "Interview of Lonnie Armachain taken by Detective David Velez, Detective Larry Jenkins and Investigator Scott Aldridge conducted at the Cherokee Indian Police Department, Cherokee, North Carolina, July 26, 2017" (hereinafter referred

to as (Int. p. \_,) and introduced into evidence as "Government's Exhibit #1A" and a CD entitled, "U.S. v. Lonnie Armachain – Armachain Interview@ CIPD on 7/26/27", which was introduced into evidence as the evidentiary hearing as "Government's Exhibit #1" Prior to the evidentiary hearing, the Court read through the transcript in its entirety on multiple occasions and reviewed Government's Exhibit #1 on multiple occasions. Although lengthy, the Court considers it important in making an adequate determination of the issues in this case to document what occurred during the interrogation of Defendant.

### 1. Government's Exhibit 1-The Video

The video initially shows Defendant, Detective David Velez, and Detective Larry Jenkins, both with the Cherokee Police Department, entering a room located in the Cherokee Police Department at 12:56:07 p.m. Defendant is immediately told by Detective Velez that he is not under arrest and he is free to leave at any time. A document introduced at the hearing as "Government's Exhibit #2," which is entitled, "CHEROKEE INDIAN POLICE DEPARTMENT CRIMINAL INVESTIGATIONS DIVISION-RIGHTS FORM" was read to Defendant line-by-line by Detective Velez. Defendant is asked after each "right" is read if he understands the "right" that has been read to him. Defendant is instructed to place his initials on a line to the right of each "right" (Int. p. 3-5) Detective Jenkins then reads the section of Government's Exhibit #2 entitled, "WAIVER OF RIGHTS" to Defendant and asks Defendant to sign that document. (Int. p. 6) The Waiver of Rights Section of Government's Exhibit #2 states:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want an attorney at this time. I understand and know what I am doing. No promises

3

or threats have been made to me and no pressure or coercion of any kind has been used against me.

Detective Jenkins then tells Defendant he is not under arrest and the officers had a report about which they needed to talk to Defendant. (Int. p. 6) Defendant is then asked about his birthdate and tribal status and states he was born on December 31, 1947, and he is a member of the Eastern Band of Cherokee Indians. (Int. p. 7)

Defendant is then asked by Detective Velez if he knows why he was asked to come to the police department. Defendant replies: "No". (Int. p. 8) Detective Velez then states it is regarding "Sylvia and Priscilla". (Int. p. 8) Without further questioning, Defendant makes a long statement about persons named "Sylvia, Priscilla, Oscar, and Jessica" and speaks of conversations Defendant had with these persons about the names of parts of the female body, riding in a pickup truck, an incident regarding a seatbelt, an incident regarding the baking of a cake with "Priscilla", and an incident with "Priscilla" wanting to run away. (Int. p. 8-18) Defendant could not recall the dates of occurrence of these conversations or events. (Int. p. 18-19) At an early stage in the interrogation, Defendant's statements clearly reveal he is a person of questionable mental acuity or comprehension and he is a person who has difficulty in explaining his thoughts and recollections.

At 13:15:36 p.m. Detective Jenkins tells Defendant a lot of things were getting said and Detective Velez and Detective Jenkins want to get Defendant "cleared of it". (Int. p. 22) "Priscilla" was then described as being twelve (12) years of age. (Int. p. 23) Detective Jenkins asked Defendant about the statements of "Priscilla" about her private parts that Defendant denied having any knowledge about. (Int. p. 24-25) Defendant was then asked

about why sexual statements were made by "Priscilla".  Defendant told the officers that "Priscilla's" older brother may be the cause. (Int. p. 27-29)  Defendant was then questioned about a report made by "Priscilla" to DSS (Department of Social Services) concerning Defendant putting a cake in an oven and that statement having been made with sexual connotations. (Int. p. 31-32)  At 13:21:36 p.m. Detective Jenkins gets up and goes to the door of the interview room.  Jenkins' firearm can be seen on his right hip and either a taser, stun gun, or an ammunition clip can also be seen on his left hip.  Defendant stares at the pistol which is between one to two feet from his face.  When Jenkins closes the door to the interview room, the sound of the door being locked can be heard.

At 13:27:00 p.m. Detective Jenkins tells Defendant a child had accused him of putting his hands down the pants of the child and touching the child's vagina. (Int. p. 34)  Defendant explained that the child had sat down on his hand. (Int. p. 34)  At 13:29:00 the two officers leave the room. (Int. p. 36)  Before the officers leave the room, Defendant is asked if he wants a drink or a cigarette, and Defendant declines to accept either. (Int. p. 36)  Defendant stays in the room, and he is seen holding his baseball cap while waiting.

At 13:35:00 p.m., the officers return to the room.  Defendant is then asked by Detective Jenkins if he wrestles with or has horseplay with some unknown person, which Defendant denies. (Int. p. 37-38)  Defendant discusses that "Priscilla" would, at times, roll cigarettes for him. (Int. p. 37)  Defendant states that he never gave a bath to any child, including his own children. (Int. p. 32)

At 13:41:24 p.m., Detective Jenkins tells Defendant he can see a pattern and he thinks something happened between "Priscilla" and Defendant.  Jenkins further tells

5

Defendant he thinks Defendant touched "Priscilla". (Int. p. 42-43) Jenkins then moves his chair and body closer to Defendant, until they are seen about one foot apart with Jenkins almost directly in front of Defendant. Defendant denies the accusation. (Int. p. 43-44) Jenkins then tells Defendant that people are accusing him of rape, and he is a monster hunting kids. (Int. p. 44) At this time, Jenkins' voice gets louder and more intense. Defendant responds that he not capable of obtaining an erection and further states he has never stuck his finger in any child. (Int. p. 44-46) Jenkins then tells Defendant that much is being said, and he wants to clear Defendant of being a monster who is raping kids. (Int. p. 46-48) Defendant again denies any instance of touching a child, either while baking a cake or driving a truck. (Int. p. 47-50) Jenkins' voice becomes louder, and he uses repeated rapid-fire questions and gives Defendant little, if any, opportunity to respond or answer Detective Jenkins' accusatory statements. (Int. p. 50-53) Detective Jenkins then tells Defendant that if he is just putting the tip of his finger in it is different from holding a kid down and raping a little child. (Int. p. 50-52) At this point Detective Jenkins puts his hand directly in front of Defendant's face and shows Defendant the tip of Jenkins' finger. When making this statement, Detective Jenkins is seen sitting within one to two feet of and facing Defendant's body. (13:43:03 p.m.) Detective Jenkins states to Defendant that "Priscilla" started making these accusations against Defendant two to three years prior to the interrogation. (Int. p. 52) At 13:45:43 p.m., Jenkins is seen having his face within twelve to sixteen inches of Defendant's face and is loudly making accusations of criminal conduct against Defendant. Velez is also seen in the video moving toward Defendant. By 13:47:00 p.m., the accusations of Jenkins are coercive, overbearing, intimidating, and insistent.

6

Jenkins repeatedly states that he does not believe the denials of Defendant. Jenkins dominates the interrogation of Defendant at this point.

At 13:49:56 p.m., Detective Jenkins states again and again that he does not believe Defendant's denials. (Int. p. 52-56) At 13:50:05 p.m., Jenkins is seen looking at his cell phone and reading a message. Immediately after looking at his cell phone message, Jenkins states that Defendant has <u>one thing</u> that Defendant can do to clear himself and at that time he asks Defendant if he is willing to take a lie detector or polygraph. (Int. p. 56)(13:50:26 p.m.) Defendant replies that he does not believe in this test. (Int. p. 56) Jenkins then tells Defendant if he takes the lie detector test and passes it the investigation would be completed. (Int. p. 57)(13:50:44 p.m.) Defendant states that the lie detector test is like a breathalyzer test, and he effectively states he has no confidence in either test. Detective Jenkins states that he wants to clear Defendant and wants Defendant's side to be true, which is unlike previous statements Jenkins has made. (Int. p. 58) Defendant then states that he will take the polygraph. (Int. p. 58)(13:52:00 p.m.) Immediately, Detective Jenkins tells Defendant, "We will go right now," and all three persons, that being Defendant, Detective Jenkins and Detective Velez, immediately stand up and walk out of the interrogation room (13:52:00 p.m.).

On Government's Exhibit A at 13:53:32 p.m. Defendant is now shown in a room with Investigator Aldridge. Aldridge is shown already talking to Defendant. Aldridge tells Defendant he is not under arrest. Defendant is heard telling Aldridge at 13:53:59 that his memory is extremely poor, which Aldridge makes light of by stating that all persons of Defendant's age have poor memory. Investigator Aldridge tells Defendant he is not under

7

arrest and further tells Defendant that Aldridge is there to get Defendant cleared of accusations which have been made against him. (Int. p. 62)  Investigator Aldridge reads to Defendant the <u>Miranda</u> warnings. (Int. p. 63)  Defendant states that he understands all of his rights and Investigator Aldridge asks Defendant to sign the "Waiver of Rights" document. (Int. p. 64)  Investigator Aldridge then tells Defendant he is going to try to get Defendant's name knocked off the list so that "they" can go on with other business. (Int. p. 64-65)  Defendant then begins making statements about one of his daughters getting into a fight and Defendant had missed some type of appointment, as if he is completely oblivious to the content and purpose of the statements which have been made to him.

Investigator Aldridge then reads to Defendant a document that informs Defendant he does not have to take the polygraph test unless he wants to do so. (Int. p. 66)  Defendant then states to Investigator Aldridge that he does not believe in the polygraph test, and he had tried to tell Detective Jenkins about his belief. (Int. p. 66-67)  Defendant again compares the polygraph test to a breathalyzer test, which Defendant believes is faulty. (Int. p. 66-67)  Aldridge tells Defendant he is taking the polygraph test voluntarily and Defendant immediately responds that Detective Jenkins made it sound like taking the polygraph was the only way for Defendant to clear his name. (Int. p. 68)  Aldridge does not respond to Defendant's statement concerning Defendant being compelled to take the polygraph test and makes no inquiry about whether or not Defendant has voluntarily agreed to take the test.  Instead, Aldridge replies that the only way for Defendant to clear his name is to take the test, thus affirming Detective Jenkins' statement that Defendant had no other choice to make.  (Int. p. 68-69)  On the other hand, Investigator Aldridge tells Defendant

8

he can walk out and leave the room and the test at any time. (Int. p. 70)  Defendant then signs the Polygraph Waiver document. (Int. p. 71)  The document was never introduced into evidence by the Government.

Aldridge then attempts to describe to Defendant how a polygraph machine is supposed to work.  After doing so, Aldridge states that a break will be taken and then Investigator Aldridge will review some questions he is going to ask Defendant, and he will then give the Defendant a practice exam. (Int. p. 73-75)  Investigator Aldridge then tells Defendant an accusation of rape has been made against Defendant and during the examination Investigator Aldridge will know what happened and what hasn't. (Int. p. 76)  Investigator Aldridge then tells Defendant the accusations are more serious for a sixty-nine year old man such as Defendant. (Int. p. 77)  Investigator Aldridge then tells Defendant the test will be given and will contain eight to ten questions, and he will ask the Defendant the questions three (3) times. (Int. p. 77)  Investigator Aldridge describes he will then let Defendant recover from the use of a blood pressure cuff, and after Investigator Aldridge has "done three (3) charts," he will take a ten to twenty minute break and they will talk about how the test went. (Int. p. 78)

When asked about his physical condition, Defendant states that he cannot walk any distance and he uses a wheelchair most of the time. (Int. p. 79-80)  Defendant states he suffers from diabetes and high blood pressure, which is not medicated. (Int. p. 80-81)  Defendant states he suffers from post-traumatic stress disorder ("PTSD") from his service in the military in Vietnam. (Int. p. 81)  Defendant states the previous night he slept three and one-half hours. (Int. p. 82)  Defendant stated he obtained his GED. (Int. p. 83)

9

Defendant further advised he was raised by his grandparents, and he never knew his father. (Int. p. 84) Defendant is divorced and initially could not remember the number of children that he had. Defendant then stated he has five (5) children and three of them are living with him. (Int. p. 86) Two of his children, who live with him, are biological and one child is adopted. (Int. p. 87) Defendant states he is concerned about a daughter who drunk some vodka at school and a meeting with "him" (who is never identified or described). (Int. p. 83) Defendant was unsure of the birthdates of his children. (Int. p. 87-88) Defendant has been disabled (he thinks) for about twenty (20) years. (Int. p. 89)

Investigator Aldridge then tells Defendant "Priscilla" has made accusations that Defendant inappropriately touched her. (Int. p. 95) This is a far different accusation than that presented to Defendant by Detective Jenkins who told the Defendant he was accused of raping two (2) children. Investigator Aldridge then tells Defendant if he did touch "Priscilla" it will come out; however, he is sure if anything did occur, Defendant would need to talk about it so Detective Jenkins could help Defendant out. (Int. p. 96)

At 14:37:01p.m., Defendant asks Investigator Aldridge for permission to use the bathroom and permission is granted. Investigator Aldridge then escorts Defendant to the bathroom. While Investigator Aldridge and Defendant were returning from the bathroom, but out of camera view, Defendant can be heard telling Investigator Aldridge that he wants to take a break and talk to his daughters. Defendant tells Investigator Aldridge that his daughters are at the Cherokee Police Department and he wants to talk to them. Investigator Aldridge replies that Defendant cannot take a break right now (14:39:30 p.m.). Investigator Aldridge tells Defendant that they will take a break in fifteen to twenty minutes and

Defendant can then go and talk to his daughters. This is the first time Defendant expressed a desire to talk to members of his family. Defendant's request to do so was refused by Investigator Aldridge. (14:39:40 p.m.).

At 14:39:44 p.m. Investigator Aldridge continues the interrogation of Defendant in the interrogation room. Investigator Aldridge reads notes to Defendant about the accusations. Investigator Aldridge states that "Priscilla" did not want to tell anyone about her accusations for fear Defendant, "her uncle," would go to prison. Investigator Aldridge states that "Priscilla" claims the incidents took place in Defendant's home while she was in Defendant's bedroom. She states that Defendant got on top of her and kissed her on the mouth. (Int. p. 99) "Priscilla" also states that Defendant held her down on a bed and touched her in parts that shouldn't be touched. (Int. p. 99) Aldridge states the last time that it happened she was sitting on Defendant's bed rolling a cigarette for Defendant and Defendant pushed her down on the bed and touched her private parts. (Int. p. 99) Investigator Aldridge states another event occurred when Defendant put his hand in her pants and touched her private parts. (Int. p. 100) Aldridge further states another event was when Defendant tried to stick his finger in her butt. (Int. p. 100) Aldridge describes the final event occurred when the victim was in bed and Defendant put his finger in her vagina. (Int. p. 100) There is no description as to when the acts underlying these allegations allegedly occurred. Defendant replied to Aldridge that he does not believe these accusations are being made and discusses a friend of Defendant who was falsely accused of similar conduct and went to prison for twenty years. (Int. p. 100-101)

Investigator Aldridge then tells Defendant if he is convicted, without any help, he

is probably looking at a twenty-year sentence, and a life sentence for a person of the age of Defendant. (Int. p. 102-103) Investigator Aldridge tells Defendant to be honest and get it on the table and let these guys (Jenkins and Velez) help him get something less than the maximum sentence. (Int. p. 103) Investigator Aldridge tells Defendant he does not think Defendant is "the booger man" and maybe things got out of hand and he made a mistake. (Int. p. 104) Defendant again states he can't believe the victim is saying these things about him. (Int. p. 104) Investigator Aldridge then tells Defendant he is struggling with this and he can tell by the way the Defendant is sitting, Defendant's body movements, Defendant's posture, and language that something happened. (Int. p. 105) Defendant, at this time, again states that he wants to talk to his daughters and get it in the open (14:51:29 p.m.). This is the second time Defendant tells Aldridge that he wants to talk to his family, who are present at the police department. At that point, Aldridge tells Defendant:

> Well, why don't you get it out in the open here and you will be able to talk to your daughters. I am confident that you will get to leave here today, regardless, whether you tell me what's happened or you don't. I'm confident that you'll be allowed to leave here and you'll have all the time in the world to talk to them at that point (Int. p. 105-106).

Defendant immediately says: "Just put it down, I did it. All that stuff. That girl come on to me and it just happened." (Int. p. 106)(14:52:00 p.m.) Defendant then grabs his baseball cap as if he is getting ready to leave. (14:52:00 p.m.) Investigator Aldridge then tells Defendant that he is a man that Investigator Aldridge can admire and then speaks aloud (evidently into an audio/video recording device) and tells Detective Jenkins to come into the room. (Int. p. 106) Investigator Aldridge then tells Defendant that this would go to his benefit. (Int. p. 107) When Detective Jenkins arrives Investigator Aldridge tells Detective

Jenkins that he is confident Defendant will be allowed to leave today and Defendant wants to be able to talk to his daughters. (Int. p. 108) Detective Jenkins and Detective Velez are seen standing in the doorway of the room (14:54:01 p.m.). In Defendant's presence Detective Jenkins replies, "OK." (Int. p. 108) Detective Jenkins and Detective Velez then come into the room with Investigator Aldridge and Defendant. Detective Jenkins asks Defendant what Defendant wants to tell them. (Int. p. 109) Defendant states the victim acted older than she was and she had kissed him and he should have pushed her away but he couldn't help himself. (Int. p. 110) Defendant denies he had sex with the victim and states he did not stick his finger in her. (Int. p. 110) The Defendant then tells the officers he kissed the victim's breasts but denies he touched the victim's vagina. (Int. p. 111-113, 122-123) Detective Jenkins then says he is going to leave the room and leaves. (Int. p. 114)

Investigator Aldridge again tells Defendant he is looking at a lengthy prison sentence. (Int. p. 115) He tells Defendant there are numerous instances where the victim says Defendant touched her vagina. (Int. p. 116) Defendant then states that the victim sat down on his hand and he had pulled his hand out. (Int. p. 116-118) At this point, Defendant still has his baseball cap in his hands and it appears he wants to leave the room. (15:04:02 p.m.) Defendant tells the officers he touched the victim's breasts maybe four or five times—maybe. (Int. p. 120) Defendant states he kissed the victim four or five times on the mouth. (Int. p. 121) Investigator Aldridge then tells Defendant he is going to give the Defendant the test, and if he asks Defendant a question on the test and Defendant fails, it would not be good. (Int. p. 124) Defendant again asks if a break can be taken. The officers

do not respond to this request. (15:09:20 p.m.)(Int. p. 124) This is the third request made by Defendant to leave.

At 15:12:34 p.m. Detective Velez asks if Defendant can wait to smoke a cigarette. (Int. p. 127) Defendant again tells Detective Velez and Investigator Aldridge that he has to talk to his daughters. Defendant looks at his watch and states that his oldest daughter has to pick up her daughter, and he has the keys in his pocket. (Int. p. 127) (15:13:00 p.m.) This is Defendant's fourth request to leave and talk to his family. Investigator Aldridge then tells Defendant that if Defendant is allowed to take a break but leaves it would not be good for him (Defendant), and Investigator Aldridge wants the Defendant to understand that fact. (Int. p. 129) At 15:14:10 p.m., Defendant again tells the officers he wants to talk to his daughters. This is the fifth request of Defendant to talk to his family. Defendant is then allowed to go outside and returns at 15:23:51 p.m. Defendant returns to the room with Detective Velez, but Detective Velez leaves at 15:24:00 p.m. Investigator Aldridge remains in the room with Defendant. Defendant tells Investigator Aldridge that he has talked to his daughters and his daughters have left. (Int. p. 130) Investigator Aldridge asks Defendant if he knows what "integrity" is. (Int. p. 130-131) Defendant responds, "My--- my personality and what---I have no clue. It's on the tip of my tongue. Don't remember now. What my intentions are in life." (Int. p. 130-131) This answer clearly indicates Defendant does not know the meaning of the word: "integrity". This lack of knowledge or mental acuity is not addressed by Aldridge.

Investigator Aldridge tells Defendant they are there to show Defendant has not done everything he has been accused of. (Int. p. 130) Investigator Aldridge then goes over some

14

questions he is going to ask Defendant. One of the questions is if Defendant has ever touched "Priscilla's" vagina. Defendant responds that he did. (Int. p. 139) However, it appears Defendant lived with a woman named "Priscilla" and Investigator Aldridge does not understand there are now two (2) persons named "Priscilla" involved in this interrogation. (Int. p. 135) There is no explanation of whether the "Priscilla" that Investigator Aldridge is referring to is the victim or if "Priscilla" is the mother of Defendant's children, except for the description of a ten or eleven year old child's vagina. (Int. p. 139) Defendant describes that he did touch the minor on top of her clothes, and it happened a couple of times. (Int. p. 140) Defendant describes these events as happening in the Defendant's bed. (Int. p. 141) Defendant describes when this happened that he would rub the vaginal area for about four (4) seconds. (Int. p. 142) Defendant does not remember when these events occurred, but then describes it as "last year". (Int. p. 142-143) Defendant then states he may have touched the victim's vagina one time with the middle finger of his right hand. (Int. p. 151-152)

At 15:57:22 p.m., Investigator Aldridge gets up and leaves the room with no explanation and then returns at 16:08:45 p.m. (Int. p. 156) Investigator Aldridge tells Defendant if some things are clarified, he will not give Defendant the "test," evidently meaning the polygraph. Investigator Aldridge asks Defendant if anything happened in June of 2017. Defendant denies the victim has been to his house during that period of time. (Int. p. 156-157) At 16:19:00 p.m., Investigator Aldridge tells Defendant that Investigator Aldridge is going to have Detective Velez come back in and take a statement from Defendant. Investigator Aldridge leaves the room at 16:22:23 p.m., and the door to the

room is left open. Defendant can be seen sitting in a chair waiting. Detective Velez comes into the room at 16:30:57 p.m.

When Detective Velez comes into the room, the only occupants are himself and Defendant. Detective Velez gives Defendant a pad and tells Defendant to write a statement. (Int. p. 165) At 16:32:00 p.m., Detective Velez walks out of the room and shuts the door. Detective Velez then returns at 16:33:27 p.m. While Detective Velez is gone Defendant initially appears to be writing on the pad he was given but when a closer examination is made Defendant is seen just holding the pen on the paper and not actually writing. Detective Velez tells Defendant to write down that he wishes the events had never happened. (Int. p. 165-166) Defendant states that he cannot remember his own telephone number. (Int. p. 166) Defendant then asks Detective Velez to write the statement for him. (Int. p. 167-169) Detective Velez tells Defendant that he cannot write the statement. Detective Velez then begins dictating to Defendant what Defendant should write on the pad. (Int. p. 168-174)

A close examination of the video shows Defendant at 16:47:00 p.m. is not writing anything on the pad for many minutes. Defendant sits and stares at the pad, but he does not write. Defendant shows the pad to Detective Velez at 16:48:38 and asks for help with writing. (Int. p. 171-172) Defendant asks Velez how to spell simple words, such as "kiss" and "removed". (Int. p. 170, 175, 181) Detective Velez then continues to dictate to the Defendant a previous oral statement Detective Velez contends Defendant has made. (Int. p. 172-173) Detective Velez tells Defendant to write certain words and phrases on the statement. (Int. p. 173-183) At one point Defendant asks Velez: "What are you saying?"

16

(Int. p. 181)  At 17:05:13 p.m. Defendant is crying and not writing anything. (Int. p. 181) Detective Velez then takes the statement from Defendant and says he will be back. (Int. p. 183)(17:07:13 p.m.)

At 17:14:00 Detective Velez returns just as Defendant gets up to go out the door. Detective Velez and Defendant meet at the entrance door to the room.  Defendant wants to go outside, and Detective Velez tells the Defendant to "hang on". (Int. p. 184) At 17:15:00, Defendant leaves the room.  At 17:16:00, Investigator Aldridge walks into the room and appears to be gathering his equipment.  At 17:22:00, Defendant walks back into the room with Detective Velez who then immediately leaves.  At 17:25:11 p.m., Investigator Aldridge leaves with his equipment.  At 17:35:00, Detective Velez comes back into the room and tells Defendant he is going to be arrested and tells Defendant he will not be allowed to leave. (Int. p. 186-187)  Defendant complains that he needs to see his daughters in order to give them money. (Int. p. 189) Detective Velez then tells Defendant his daughters have already left. (Int. p. 190)  At 17:42:00, Defendant asks to go to the bathroom and is escorted out of the room by Detective Velez.

At 17:44:00 Detective Velez and Defendant walk back into the room.  The door to the room is open.  Defendant then begins to make a statement without being asked any questions and at that time he states he kissed the victim. (Int. p. 194)

### B.     THE EVIDENCE AT THE HEARING

#### 1.     Government's Witnesses

##### a.     Detective David Velez

At the hearing, Detective David Velez was called as a witness for the

Government. Detective Valez is a detective with the Cherokee Indian Police Department. (Tp. 9) Detective Velez has been employed with the Cherokee Police Department for nine years and has been a detective for one year. (Tp. 10, 37) At the time of Defendant's interrogation, which took place on July 26, 2017, Detective Velez had been a detective with six or seven months experience. (Tp. 37) His duties included investigating crimes against children. (Tp. 11) Prior to the interrogation of Defendant, Detective Velez had not received any formal training regarding interrogating a subject or avoiding witness coercion during an interview. (Tp. 12, 37-38, 45)

Detective Velez stated he first became aware of a case where Defendant might be a suspect when he received information from Cherokee Family Safety, which is what the Eastern Band of Cherokee Indians refers to as their Department of Social Services. (Tp. 13) The information that Detective Velez received regarded the possible sexual abuse of a child. (Tp. 13) Detective Velez set up appointments for forensic interviews of two (2) alleged victims. (Tp. 14) Detective Velez was not present for the interviews, but he watched them on a monitor. (Tp. 14) Based upon he learned from the interviews he decided to speak to Defendant. (Tp. 15) Detective Velez called Defendant on July 21, 2017, and Defendant agreed to meet with him on July 26, 2017, at the Cherokee Indian Police Department. (Tp. 15)

On July 26, 2017, Detective Velez met Defendant in the lobby of the Cherokee Indian Police Department. (Tp. 17) Accompanying Defendant were three (3) of his daughters, one was 18 or 19 years old and two other younger girls. (Tp. 17) Defendant was

taken to the back of the police department while his daughters waited in the lobby. (Tp. 18) Detective Velez took Defendant to Interview Room No. 142. (Tp. 19) This room was designed to have access to video and audio recording equipment. (Tp. 20) Detective Velez told Defendant he was not under arrest, the door to the interview room was not locked, and he was free to leave. (Tp. 27, 40) Detective Velez testified he then advised Defendant of his <u>Miranda</u> rights by reading them to Defendant from a form. (Tp. 22)(Gov. Ex. #2) Defendant signed the form and then initialed each respective right about which he was advised. (Tp. 22, 24) Detective Velez did not ask Defendant if he had any physical impairments, if he was on any medication, how much he had slept the previous evening or if he had eaten. (Tp. 39-40) Detective Velez testified that at no point did he ever see the Defendant being threatened, assaulted, drugged or given alcohol. (Tp. 26) He further testified Defendant was free to leave and Defendant could have left the interview room if he had wanted to. (Tp. 27)

Detective Velez testified that he, Detective Jenkins and Investigator Aldridge all told Defendant that he would be able to go home at the end of the interrogation. (Tp. 36) Detective Velez further testified Defendant, contrary to what Defendant had been told, was placed under arrest at the end of the interrogation. (Tp. 36-37)

In his testimony, Detective Velez stated Defendant never seemed confused or unaware of what was going on and he understood and answered the questions that Detective Velez posed to him. (Tp. 28-29) Detective Velez testified that the first portion of the interrogation of Defendant lasted one hour. (Tp. 29) After that time there was a break

and Defendant was asked if he needed to use the bathroom or get a drink; but, the Defendant declined. (Tp. 29-30) The next phase of the interrogation took place in a second interview room with Investigator Aldridge, and Investigator Aldridge took over this portion of the interview. Detective Velez testified that, at this point, he left the interview room. (Tp. 30)

Detective Velez testified that one hour later Defendant confessed and Velez went back into the second interview room with Detective Jenkins. Velez stated that Detective Jenkins then questioned Defendant. (Tp. 30-31) Detective Jenkins then left the room and Investigator Aldridge came back in and the interrogation of Defendant continued. (Tp. 31) Detective Velez testified that breaks were taken, no threats were made, no force was applied, and nothing was done to coerce Defendant. (Tp. 32)

Detective Velez testified that near the end of the interview he asked Defendant to provide a written statement. (Tp. 33) Defendant repeatedly asked Detective Velez to write the statement for him. (Tp. 46) Detective Velez testified he read to the Defendant from the notes of Investigator Aldridge, and Defendant asked him several times what Defendant had said to Investigator Aldridge. (Tp. 46)

During cross examination, Detective Velez was asked about the fact that Defendant had, on several occasions, requested to be allowed to speak to his daughters and about the fact that Detective Velez and Investigator Aldridge would not allow Defendant to do so. (Tp. 41-43) Detective Velez testified he thought Defendant had been allowed to speak to his daughters, but he was not sure. (Tp. 42-43)

### b. Investigator Scott Aldridge

Scott Aldridge was called as a witness for the Government. Aldridge testified that he had been employed as an investigator with the Buncombe County Sheriff's Office since August 21, 2017. (Tp. 48) He performs background investigations and polygraph examinations for all new hires for the Buncombe County Detention Center. (Tp. 48) Aldridge was employed as a Department of Corrections Officer for approximately nine months. After that, he was employed as a North Carolina State Probation Officer for seven years and then he was employed as a United States Probation Officer in the Western District of North Carolina for 22 years. (Tp. 49) After his retirement, he went to the Academy of Polygraph Science and became certified to give polygraph examinations in 2013. (Tp. 49)

Investigator Aldridge testified that a polygraph is an instrument that is used to determine if someone is being truthful or deceptive. (Tp. 50) Aldridge received training during a ten-week course, passed the course, and received two certifications: one for basic polygraph examinations and the other for post-conviction sex offender testing. (Tp. 50) Aldridge testified that, in the year 2014, he entered into a contract with the Eastern Band of Cherokee Indians Police Department to perform polygraph examinations. (Tp. 50) He testified that he had been trained to administer polygraphs according to the guidelines and procedures accepted and endorsed by the American Polygraph Association ("APA"). (Tp. 74) One of those standards of practice was that the polygraph examiner should conduct the examination in a neutral manner. (Tp. 74)

Investigator Aldridge testified that, at the beginning of the interview of Defendant, he asked Defendant questions to ascertain Defendant's mental and physical state on that particular day. (Tp. 72) Defendant stated that he suffers from diabetes and blood pressure and heart issues. (Tp. 72-73, 83) Investigator Aldridge testified that Defendant also reported age-related back, hip, and leg pain, but he stated he was in no pain on the day of the interrogation. (Tp. 73, 83-84) Investigator Aldridge further testified that Defendant reported he suffers from PTSD as a result of his military service in Vietnam. (Tp. 73, 83) Investigator Aldridge testified Defendant told him that he normally sleeps five to six hours per night, and the night prior to July 26, 2017, Defendant reported he had slept three to five hours. (Tp. 73) Investigator Aldridge testified none of Defendant's answers to his questions gave Investigator Aldridge any concern about the administration of the polygraph. (Tp. 73)

Investigator Aldridge testified that, during the first five minutes with Defendant, he noticed nine (9) different indicators of deception on the part of Defendant. (Tp. 77) Investigator Aldridge explained, in his testimony, that he employed the "LL-Square Method" which was developed by CIA agents that specialize in interrogation and espionage cases. (Tp. 77-78) Investigator Aldridge testified he did not learn the LL-Square Method during his training to be a polygraph operator. (Tp. 78) Investigator Aldridge further testified that he did not have a name for this method until 2017. (Tp. 78)

Investigator Aldridge testified that, prior to July 26, 2017, Detective Jenkins had called him and had asked him if he would come to the Cherokee Police Department on July

26, 2017, because there was a person coming in that the police department wanted polygraphed. (Tp. 53-54) On July 26, 2017, Investigator Aldridge went to the Cherokee Police Department and brought his polygraph equipment with him. (Tp. 54)

In his testimony, Investigator Aldridge stated the point of him being present with the polygraph was his ability to do interviews. (Tp. 56) He stated that sometimes when an individual knows they are getting ready to take a polygraph, rather than doing so, they will typically confess. (Tp. 56) He further testified that if an individual takes a polygraph examination, and it shows they are being deceptive,then the person will go ahead and confess. (Tp. 56) The presence of a polygraph is a technique used to get persons to go ahead and talk to officers. (Tp. 56-57)

In his testimony, Investigator Aldridge stated that, at one point Defendant asked to speak to his daughters, who were in the lobby of the police department, and Investigator Aldridge did not allow Defendant to do so. (Tp. 61) It was Investigator Aldridge's opinion that the interview was at a pivotal point and there was the possibility of a confession being forthcoming. (Tp. 61-62) Investigator Aldridge did not feel comfortable allowing Defendant to leave the room at that point or to voluntarily take Defendant out of the room to see his daughters "and then while he's out there to come back in refreshed and ready to recant anything that he might have said or was getting ready to say." (Tp. 62) It was Investigator Aldridge's testimony that, if Defendant had stood up and walked out, at that time Investigator Aldridge would not have stopped him and further if Defendant had insisted he would have taken Defendant to see his daughters. (Tp. 62)

Investigator Aldridge testified that during his interrogation of Defendant he did not offer promises of leniency. (Tp. 82)  He explained that he told Defendant that Defendant would be in a better position to help himself if he was responsible for anything if he would go ahead and take responsibility but Aldridge did not consider that to be a promise of leniency. (Tp. 82)  Investigator Aldridge further testified that he did tell Defendant he was looking at a potential twenty (20) year sentence which would be a life sentence unless Defendant helped himself. (Tp. 82-83)  It was the opinion of Investigator Aldridge that he did not observe any mental health issues regarding Defendant other than Defendant's inability to recall dates. (Tp. 84-85)

On cross examination, Investigator Aldridge testified that Defendant asked twice to be allowed to go and speak with his daughters. (Tp. 86-87)  The first time Defendant asked to speak to his daughters,  Investigator Aldridge admitted that he did not allow Defendant to do so because he was close to having Defendant make a statement. (Tp. 86)  Investigator Aldridge testified that the second time Defendant made a request to go and speak to his daughters he had told Defendant there was more that the Defendant had to get out in the open and Investigator Aldridge again did not allow Defendant to see his daughters. (Tp. 86-88)  By way of explanation, Investigator Aldridge testified that just a few weeks prior to July 26, 2017, he was performing a polygraph in Cherokee and the subject of that investigation chose to leave. (Tp. 88-89)  The person was in a position whereby she could have helped herself by staying for the interview but she chose to leave and the next step

was for officers to get a warrant for her arrest. (Tp. 88-89)  Investigator Aldridge further testified he told Defendant that, if Defendant left, it would be bad for him. (Tp. 89)

Upon examination by the Court, Investigator Aldridge stated that he had told Defendant, in response to Defendant's request that he would like to talk to his daughters, that: "You might as well get it out in the open here and you will be able to talk to your daughters and I am confident that you will get to leave here today, regardless of whether you tell me what else happened.  I am confident that you will be allowed to leave here and you will have all the time in the world to talk to them at that point."  Aldridge admitted Defendant was not allowed to leave. (Tp. 92) Investigator Aldridge did so because historically persons being interrogated are allowed to leave and Investigator Aldridge thought Defendant's matter would be handled in the same fashion. (Tp. 92)

### c.    Detective Larry Jenkins

Detective Larry Jenkins has been employed with the Cherokee Police Department since August of 2013.  He works as a Detective in the Child Victim Unit. (Tp. 98, 101-102)  Detective Jenkins testified that he does not recall whether he reviewed the forensic interviews of the alleged victims prior to the interrogation of Defendant.  (Tp. 102) Jenkins testified that Defendant seemed clear headed, focused, and attentive to the questions and the types of things about which Jenkins was asking the Defendant. (Tp. 99) Detective Jenkins did not recall whether or not he was wearing a handgun while he was interrogating Defendant. (Tp. 99) Jenkins testified that it was the decision of Detective Velez to charge Defendant and that this decision was made after the Defendant was interrogated by

Aldridge. (Tp. 100) Detective Jenkins testified that Detective Velez was the lead on this case and Jenkins had not conducted any of the investigation. (Tp. 102) Detective Jenkins admitted that he had made accusations to Defendant during the interrogation. (Tp. 105) Detective Jenkins stated he had not been trained to ignore denials by defendants about what occurred in an event, and based upon his experience in dealing with most people, they do deny things during an interview. (Tp. 105) Detective Jenkins further testified he did not have any authority to make a promise of leniency to Defendant. (Tp. 106) Detective Jenkins does not recall if he watched the entire interrogation of Defendant because he was not the lead investigator in the case. (Tp. 106-107) The Court notes that Detective Jenkins' testimony regarding what happened during the interrogation of Defendant is markedly different in factual content from that shown on Government's Exhibit #1. The Court further notes that neither the Government nor Defendant questioned Officer Jenkins about his conduct during the interrogation of Defendant.

### 2. The Defendant's Witnesses

#### a. Dr. Richard Leo

Dr. Richard Leo ("Dr. Leo") was called by Defendant, and it was stipulated that he was testifying as expert in the field of social psychology, criminology, and the specific study of police interrogation, psychological coercion and involuntary confessions. (Tp. 110) Dr. Leo holds a bachelor's degree in sociology and a master's degree in sociology, a Juris Doctor degree and a Ph.D. (Tp. 112) Dr. Leo's Ph.D. program training specialized in social psychology, which is one branch of the discipline of psychology and in criminology

and sociology, as they related to the law and the legal system. (Tp. 113)  From 1994 to 1997, Dr. Leo was a professor of sociology and law at the University of Colorado-Boulder. (Tp. 112)  From 1997 to 2006, Dr. Leo was a professor of psychology and criminology at the University of California-Irvine.  (Tp. 111-12.)  Since 2006 Dr. Leo has been a professor of law and psychology at the University of San Francisco. (Tp. 116)

Dr. Leo testified interviewing involves a broader group of people, and interrogation is limited to suspects.  (Tp. 117)  Interviewing involves open-ended questions with the person being interviewed do most of the talking. (Tp. 117)  Interviewing is non-accusatory and the goal of an interview is to get information.  (Tp. 117)

An interrogation is limited to suspects.  (Tp. 118)  Law enforcement officers are trained to interrogate only when they have concluded that someone has committed a crime. (Tp. 118)  Interrogation is accusatory and is guilty presumptive by design. (Tp. 118)  The goal is to get a confession and not information. (Tp. 118)

Dr. Leo testified that psychological coercion usually refers to methods of interrogation which cause a suspect to see they have no meaningful choice but to cooperate. (Tp. 122-123)   Techniques, such as excessively long interrogations, physical or psychological deprivation, and implied or explicit promises or threats might be regarded inherently coercive because they are so potent that they are likely to overbear an individual's ability to resist. (Tp. 123)  The risk of using such a confession is that it could be unreliable because it is either partially or wholly false. (Tp. 124)

In preparation for his testimony, Dr. Leo reviewed the DVD of the July 26, 2017 interrogation of the Defendant (Gov. Ex. #1); the transcript of the interrogation (Gov. Ex. #1A); Priscilla's forensic interview; Sylvia's forensic interview; the Bill of Indictment; sixty-six (66) pages of discovery; Defendant's Motion to Suppress Statements; the Government's Response; Dr. Scott Bender's report (Defendant's Exhibit 2); and Dr. Sharon Kelley's report (Defendant's Exhibit 3).[1] (Tp. 124-25) Dr. Leo was also present in the courtroom to hear the testimony provided by Detective Velez, Investigator Aldridge, and Detective Jenkins. (Tp. 125)

In Dr. Leo's opinion, the interrogation of Defendant was a guilt-presumptive interrogation. (Tp. 126) Dr. Leo was further of the opinion that Defendant's interrogation went on much longer than most other typical interrogations. (Tp. 126) Finally, Dr. Leo believed that both psychologically-coercive and non-coercive techniques were employed. (Tp. 126)

The interrogation techniques used on Defendant include a presumption of guilt or bias. (Tp. 126-127) The following are dangers involved with a guilt-presumptive approach: (1) the investigators make up their mind in the absence of all the information that might cut against their theory; (2) when interrogators presume guilt, they become confident that they know what the answers are, which makes them more prone to error; (3) the interrogator has greater confidence, and they are more aggressive in their interrogation;

---

[1] The full names of the victims have been excluded to prevent identification.

and, (4) the interrogator reads the suspect's behavior as confirming their presumption of guilt, which can be erroneous.  (Tp. 127-128)

Investigator Aldridge testified that Defendant exhibited nine different examples of potential deception.  (Tp. 129)  Dr. Leo stated that he did not observe any of these physical indicators of deception in Defendant.  (Tp. 129) According to Dr. Leo, there have been numerous studies on these physical indicators, and most people get it right 55% to 60% of the time.  (Tp. 130)  In summary, it is barely more diagnostic than a coin flip.  (Tp. 130) The literature has repeatedly shown that the so-called cues of deception do not actually demonstrate whether a person is lying or telling the truth.  (Tp. 130) Dr. Leo stated that Investigator Aldridge essentially testified that he can act as a human lie detector.  (Tp. 154) Dr. Leo opined that one cannot reliably infer from how somebody is sitting or their body movements whether or not they are lying.  (Tp.  154)  This area of police training, which is essentially training to be human lie detectors, is not supported by science. (Tp. 131) Body language or demeanor-based indicators of deception are not reliable.  (Tp. 131)

Dr.  Leo  looks  for  techniques.  (Tp.  131)  One  technique  is  called minimization/maximization. (Tp. 131) The term "minimization" refers to scenarios that minimize the suspect's blameworthiness or culpability or the consequences that will follow if the suspect agrees with the accusation and admits they did it.  (Tp. 132-33) The term "maximization" corresponds to the technique of the bad scenario, the scenario where the suspect does not agree to the suggestion made that they did the act intentionally or for the worst possible motive, and are therefore, more blameworthy, more culpable, and the

consequences will be far worse. (Tp. 133) The minimization/maximization language was created by academic researchers to describe interrogation techniques that have been taught for decades by the Reid Method and others. (Tp. 133) Dr. Leo opined that Defendant's interview involved multiple examples of minimization/maximization. (Tp.134-135) The risk with maximization/maximization is that the suspect will infer leniency if they admit wrongdoing. (Tp. 136) On the other hand, the risk is also that the suspect will infer a threat of incarceration or harsher treatment if they continue to deny wrongdoing. (Tp. 136) This can lead to an involuntary statement or an unreliable statement if the suspect does make these inferences. (Tp. 136) In general, minimization/maximization is not necessarily problematic. (Tp. 136) It was Dr. Leo's opinion the instances of minimization/maximization in this case, however, were problematic. (Tp. 136)

A promise of leniency or threats of harm is another technique. (Tp. 136) A promise of leniency to a social psychologist would be anything that is implied or said or made explicit that the suspect will receive in exchange for complying with the interrogator's request or demands and agreeing with the accusations or making a narrative confession they will receive some benefit and the system will go more lightly on them and they will receive more lenient treatment. (Tp. 137) This can take the form of receiving probation instead of a prison sentence, receiving jail instead of prison, getting fewer charges, or getting no charges at all. (Tp. 137-38) In Dr. Leo's opinion anything from which the suspect could infer that if they continue to deny they will receive a harsher, less favorable, or worse treatment would be considered as a threat or an implied threat. (Tp. 138) A

30

promise of leniency can be inherently coercive. (Tp. 139) Dr. Leo testified that threats and/or promises, implicit or explicit, are either inherently psychologically coercive or potentially psychologically coercive. (Tp. 139) Promises and threats, implicit or explicit, are powerful psychological factors during police interrogations. (Tp. 140)

Dr. Leo stated a normal interrogation lasts between a half-hour to an hour. (Tp. 148) There are no bright line rules, but the Reid Manual says that an interrogation should not go over four hours unless it is an extreme situation. (Tp. 150) If you go over four hours, it is going to start looking coercive, and the confession may not be admitted. (Tp. 150) Dr. Leo further testified interrogations resulting in a false confession typically go on for six hours or longer. (Tp. 148) The effects of a lengthy interrogation are that the suspect becomes more suggestible. (Tp. 148) Dr. Leo testified the longer the interrogation continues the suspect's ability to resist weakens. (Tp. 149) The suspect will become more vulnerable to coercion and more likely to agree to an involuntary statement. (Tp. 149)

Dr. Leo also stated that sleep deprivation tends to go along with the length of the interrogation. (Tp. 149) The longer interrogations will go overnight and will involve the suspect being sleep deprived. (Tp. 149) That did not happen in this case, but Defendant reported to Investigator Aldridge that he only had three hours of sleep the previous night. (Tp. 149)

In his testimony, Dr. Leo provided the definition of the term "instrumental interrogation," which refers to a polygraph examination that is really functioning as an interrogation. (Tp. 151) The traditional polygraph is supposed to consist of pre-polygraph

interviewing, administration of the polygraph, and then possibly a post-interview.  (Tp. 151)  With an instrumental interrogation, from the beginning, the whole goal of the polygraph is to really function as an interrogation to get the confession.  (Tp. 151)  The polygraph can be used as a method of truth verification, but it is not scientifically reliable.  (Tp. 151-52)  In Defendant's interrogation, there was not a use of a polygraph but there was an instrumental interrogation.  (Tp. 152)  It was the opinion of Dr. Leo that the instant case was an interrogation from the beginning. (Tp. 152)  Investigator Aldridge presumed Defendant's guilt and Aldridge's goal was to get an admission from the Defendant.  (Tp. 152)  Investigator Aldridge had some "creative interpretations" of body language in his testimony, which he said justified actions he took.  (Tp. 152)  This was a straight interrogation and that was what Investigator Aldridge was there to obtain.  (Tp. 152)

In Dr. Leo's opinion another technique was used in this case which is called the "false evidence ploy".  (Tp. 152)  False evidence ploy is the academic term for lying to a suspect about nonexistent or ambiguous evidence.  (Tp. 153.)  This is legal in the United States, and it is not inherently a coercive technique.  (Tp. 153.)  False evidence ploy, when combined with other techniques can increase the risk of getting an unreliable or involuntary statement.  (Tp. 153)  Standing alone, the technique is not likely to get either a false confession or an involuntary one.  (Tp. 153)  Police officers use the term "ruse," which is kind of a euphemism for lies about evidence.  (Tp. 153)  "False evidence ploy" is the academic term for lies about evidence.  (Tp. 153)

Dr. Leo stated that Defendant's personality aspects and personal characteristics put him at a heightened risk for an involuntary confession. (Tp. 155) For instance, Dr. Kelley tested Defendant and found he had far higher personal suggestability and was far more likely to be compliant. (Tp. 155) The PTSD, diabetes, high blood pressure, and anxiety disorder suffered by Defendant and some of the neurocognitive "stuff" might explain why Defendant has such a high degree of suggestability and compliance that makes him so much more vulnerable to making or agreeing to an involuntary or unreliable statement. (Tp. 155-156) Also, Defendant's suggestibility and compliance would have been heightened by any sleep deprivation. (Tp. 156)

The term "suggestibility" is defined as the characteristic where you yield to the suggestions of others, even if they are misleading, and give them back without much resistance. (Tp. 156) The term "compliance" is defined as essentially acquiescence or obedience. (Tp. 156) Suggestibility and compliance are analytically distinct if overlapping concepts. (Tp. 156) When asked about contamination, Dr. Leo explained that the researchers and training manuals are in agreement that it's not a good practice to educate a suspect about a crime. (Tp. 157) Rather, if the suspect says I did it, you want them to voluntarily provide details. (Tp. 157) The problem is if the suspect feeds back when he's been educated about it doesn't tell you whether they had any preexisting personal knowledge that you would expect only the perpetrator to know. (Tp. 157-158)

Contamination and a related term, scripting, are frowned upon by law enforcement. (Tp. 158.) The term "contamination" refers to leaking or disclosing to the suspect

nonpublic details of a crime or an alleged crime. (Tp. 157) The term "scripting" refers to pressuring the suspect to adopt an explanation that explains the act as opposed to letting the suspect provide it. (Tp. 158) Holdback evidence refers to things you are supposed to hold back to get the suspect to admit. (Tp. 158) Dr. Leo explained that the problem with contamination is that it is often why defendants put details in their confession. (Tp. 158) Others, particularly jurors, look at the detailed-confession and assume it must be reliable. (Tp. 158) Dr. Leo stated that he observed four or five examples of law enforcement suggesting details to Defendant. (Tp. 159) The law enforcement officers told Defendant what the accusations were and then essentially told him what they wanted him to repeat back to confirm their belief that he was guilty. (Tp. 159) This presented issues of both coercion and contamination. (Tp. 159)

Dr. Leo opined that Defendant's interrogation was psychologically coercive. (Tp. 160) First and foremost, it was psychologically coercive because of the promises and threats. (Tp. 160) Defendant was led to believe the only way he would avoid serious negative consequences was if he told law enforcement what they wanted to hear, and that was psychologically coercive. (Tp. 160) There were threats and promises of varying degrees, which is what ultimately made Defendant confess. (Tp. 160-161)

Dr. Leo never personally met with Defendant. (Tp. 162) Dr. Leo did not interview Defendant's friends or family members. (Tp. 162-163.) Dr. Leo's report is dated February 13, 2018, which permitted him to review Dr. Kelley's and Dr. Bender's reports. (Tp. 163)

### a(i)- Dr. Leo's Report

A report prepared by Dr. Leo was introduced into evidence as Defendant's Exhibit #1. In the report, Dr. Leo provides the following opinions and conclusions:

1.    The custodial interrogation of Lonnie Armachain was guilt-presumptive, accusatory and theory driven rather than evidence driven. The interrogation was not structured to find the truth but, instead, to intentionally incriminate Mr. Armachain by pressuring and persuading him to repeat back an account that Investigator Aldridge and Detectives Velez and Jenkins never sought to clarify, but simply assumed must be true.

2.    Investigator Aldridge and Detectives Velez and Jenkins used interrogation techniques that are known to increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent (i.e. situational risk factors). These included: lengthy interrogation, false evidence ploys, minimization, maximization, and implied and explicit promises of lenience (in exchange for agreeing to the interrogators' accusations) and implicit and explicit of harsher punishment (in the absence of agreeing to the interrogators' accusations).

3.    Investigator Aldridge and Detectives Velez and Jenkins' interrogation of Lonnie Armachain was psychologically coercive, in that: they used interrogation techniques that, as social science research has shown, are highly likely to cause a suspect to perceive that he has no choice but to comply with the interrogators' demands and/or requests and that are known to increase the risk of eliciting involuntary statements, admissions, and/or confessions.

4.     Lonnie Armachain was at a substantially heightened risk during his interrogation of having his will overborn and making and/or agreeing to a false and unreliable confession or statement because of his personality traits and psychological make-up (i.e. personal risk factors) especially his cognitive and intellectual deficits, low intellectual function, impaired executive function, poor memory, attentional deficits, anxiety disorder, confused thinking, post-traumatic stress disorder, and history of alcohol abuse.  These traits render him both more compliant and more suggestible.

5.     Investigator Aldridge and Detectives Velez and Jenkins educated Mr. Armachain about the alleged crime during the interrogation, thereby contaminating Mr. Armachain (violating National Best Practices Standards) in pressuring and persuading Mr. Armachain to adopt the interrogators' description narrative that they assumed must have occurred because of the alleged victims' statements.

### b.     Dr. Scott Bender

Dr. Scott Bender ("Dr. Bender") was called as a witness by Defendant.  The Government agreed to stipulate that Dr. Bender is an expert in the field of neuropsychology.  (Tp. 198)  Dr. Bender's C.V. (Def.'s Ex. 2A) was introduced into evidence.  (Tp. 198)

Dr. Bender is a clinical neuropsychologist who is currently employed at the University of Virginia where he is an associate professor of psychology and neurobehavioral science.  (Tp. 199)  Dr. Bender is licensed in the state of Virginia.  (Tp.

199)  At the request of defense counsel, Dr. Bender conducted a neuropsychological evaluation of Defendant.  (Tp. 199)

Dr. Bender stated that neuropsychology and clinical psychology are both branches of psychology.  (Tp. 199-200)  Neuropsychology focuses on the relationships between brain and behavior, with the emphasis being on brain function.  (Tp. 200)  A neuropsychological evaluation includes a clinical interview, a collateral interview (which means an interview with someone who should know the patient well) and a standardized formal assessment of neuropsychological functions. (Tp. 201) Neuropsychological function refers to the areas of the brain that control attention and concentration, vision, hearing, speed, language, perception, learning and memory, executive functions, and mood. (Tp. 201) A whole host of things go into a neuropsychological evaluation, and the evaluations tend to be quite long.  (Tp. 201)

In connection with Defendant's evaluation, Dr. Bender was provided Defendant's medical records covering a long period of time.  (Tp. 200)  Dr. Bender interviewed both Defendant's daughter and Defendant.  (Tp. 200-201)  Dr. Bender spent between 5-6 hours interviewing Defendant in late November 2017.  (Tp. 201, 213)  At the time, Defendant had been incarcerated for approximately four months.  (Tp. 214)  Dr. Bender had no prior encounters with Defendant, and Dr. Bender did not know what Defendant was like prior to spending several months incarcerated.  (Tp. 214)  Dr. Bender did not watch the video of Defendant's interrogation.  (Tp. 214) (Gov. Ex. #1)

During Dr. Bender's interview with Defendant, he conducted a multitude of tests on Defendant. (Tp. 201-202) The tests conducted are standard for the field of neuropsychology. (Tp. 202) Based on his review of Defendant's medical records and the interview of Defendant and testing, Dr. Bender opined that Defendant suffers primarily from a major neurocognitive disorder. (Tp. 202) A major neurocognitive disorder generally exhibits a specific decline in cognition as shown in multiple domains or one or more cognitive domains. (Tp. 202-203) A neuropsychological battery of tests is the gold standard for determining this. (Tp. 203) When it is very severe, you do not need to do an evaluation. (Tp. 203) In this case, the tests were conducted. (Tp. 203) Dr. Bender concluded that there were deficits over cross domains. (Tp. 204)

Defendant scored in the low average or within normal limits range in a couple of things. (Tp. 204) Defendant's simple processing speed was low average. (Tp. 204) One of Defendant's academic skills tests was average. (Tp. 204) There were maybe a handful of scores that were within normal limits; but, the vast majority were not. (Tp. 204) The memory test showed that Defendant's ability to acquire new information was impaired. (Tp. 205) Executive functioning also showed impairment as well. (Tp. 205) Defendant's complex attention, that is, the ability to work through information in your head, was significantly impaired and much lower than expected for his age. (Tp. 205)

The diagnosis of a major neurocognitive disorder is just the terminology that used to be used for dementia. (Tp. 205) There are multiple possible causes of dementia. (Tp.

205)  Alzheimer's disease is one possible cause and it is the most prevalent.  (Tp. 205-206)
Other causes include Huntington's, Parkinson's, or a traumatic brain injury.  (Tp. 206)

Dr. Bender opined that what he saw in Defendant was reflective of potential Alzheimer's.  (Tp. 206)  The only way to definitively define Alzheimer's disease is an autopsy.  (Tp. 206)  Dr. Bender noted that he also saw signs of vascular dementia as well.  (Tp. 206)  Defendant has a history of vascular disease, so vascular dementia cannot be ruled out.  (Tp. 206)

Defendant had symptoms of PTSD, which can affect a diagnosis of dementia or Alzheimer's.  (Tp. 206)  The links with PTSD are not as direct as they would be with Alzheimer's disease.  (Tp. 207)  There is, however, growing research that suggests that chronic PTSD can impair the limbic system in a way that impairs memory function.  (Tp. 207)  Prior alcohol abuse can also affect memory problems.  (Tp. 207)  This is true during the moment of use and many years later.  (Tp. 207)

A classic sign of Alzheimer's disease is generally intact or at least grossly intact remote memory, memory of things that happened a long time ago, and impaired new memory, which refers to the things that you're trying to learn since the diagnosis or the onset of the illness.  (Tp. 208)  Alzheimer's disease and dementia are not just on or off.  (Tp. 208)  They fluctuate according to environmental influences.  (Tp. 208-209)  There is also something called "sundowning" that affects people with Alzheimer's disease and other diseases also, which causes them to get worse just because it is later in the day.  (Tp. 209)

A circadian influence refers to your biological rhythm associated with the need for sleep. (Tp. 209) It is most prominent at night. (Tp. 210)

Individuals with Alzheimer's or neurocognitive disorders are generally more vulnerable. (Tp. 211) They are vulnerable in a number of ways. (Tp. 211) It is a general vulnerability. (Tp. 211) They are more fragile and vulnerable to all sorts of things, such as disease, illness, falls, and being taken advantage of. (Tp. 211) Exploitation is more common. (Tp. 211)

The onset of symptoms with a major neurocognitive disorder depends entirely on the cause. (Tp. 212) For example, in stroke cases, the onset would be abrupt. (Tp. 212) In the case of Alzheimer's disease, by definition, it is a gradual progressive onset and progression of symptoms. (Tp. 212) Dr. Bender did not observe anything that led him to believe Defendant had sudden brain trauma to expedite the onset of his diagnosis. (Tp. 213) Any kind of event that took place with Defendant happened many years ago. (Tp. 213) Defendant had a concussion a long time ago, and that potentially could have been a cause. (Tp. 213)

Dr. Bender noted that the symptoms he saw and the deficits that showed up on testing were all present. (Tp. 215) These symptoms and deficits "may" have been exacerbated by spending four months in jail. (Tp. 215) Situational factors can influence an individual's performance, but not in a way that would change the diagnosis. (Tp. 215)

Defendant has a number of problems, and memory is clearly one of them. (Tp. 216) Other major problems which Defendant has are the executive functions, processing speed,

and working memory. (Tp. 216) An example of executive functions is weighing options and then efficiently coming to a conclusion based on limited feedback efficiently. (Tp. 216) Defendant's immediate and delayed recall is borderline. (Tp. 216) Immediate recall is the ability to recall a story right after it has been read. (Tp. 216) Delayed recall is recall after a fixed period of time. (Tp. 216-217) Borderline refers to the range between the lowest generally intact range and impaired. (Tp. 217)

Defendant's result on the WRAT4 test was low average. (Tp. 218) Defendant was about at a fifth grade level in reading and a seventh grade in his sentence comprehension. (Tp. 218) Defendant's spontaneous speech was generally fluent. (Tp. 218) Defendant conveyed information satisfactorily. (Tp. 218) Defendant's comprehension of questions was normal, so long as they were phrased in fairly simple terms. (Tp. 218) Defendant did not have any trouble understanding what Dr. Bender was asking him to do during the testing. (Tp. 218)

Defendant's performance on a brief cognitive status exam was low average. (Tp. 220) The testing indicated that Defendant is likely to have depression, but Dr. Bender found that Defendant did not seem to have symptoms of depression prior to incarceration. (Tp. 220) Defendant can have some days that are better than others. (Tp. 221) As for July 26, 2017, Dr. Bender had no idea what kind of day it was for Defendant. (Tp. 221)

### b(i)- Dr. Bender's Report

Dr. Bender wrote a report (Def.'s Ex. #2) that was referred to during his testimony. (Tp. 223) The report was admitted into evidence without objection. (Tp. 223) In Dr.

Bender's report, which was introduced into evidence as Defendant's Exhibit 2, Dr. Bender states the following diagnosis of Defendant:

1. Major neurocognitive disorder due to multiple etiologies including possible Alzheimer's Disease, vascular disease, hypertension, diabetes and heavy alcohol use;

2. Depression;

3. Symptoms of PTSD; and

4. Past alcohol use disorder, in sustained remission.

Dr. Bender talked to Defendant's daughter, Catherine, who has lived with the Defendant. She described Defendant as not able to take care of himself and that he has a really bad memory. She described Defendant's memory as becoming worse over the past year. She further described that Defendant often forgets appointments and is easily sidetracked, even to the point of getting lost while driving.

### c. Dr. Sharon Kelley

Dr. Sharon Kelley ("Dr. Kelley") was called as a witness by Defendant. The Government stipulated that Dr. Kelley was an expert in the field of clinical psychology. (Tp. 226) Dr. Kelley's C.V. (Def.'s Ex. 3A) was admitted into evidence without objection. (Tp. 226)

Dr. Kelley explained that she is a clinical and forensic psychologist and assistant professor in psychiatry and neurobehavioral sciences at the University Of Virginia School

Of Medicine. (Tp. 227) Dr. Kelley has a license in clinical psychology in the state of Virginia. (Tp. 227) Dr. Kelley has also obtained her Juris Doctor degree. (Tp. 261)

Dr. Kelley explained that a neuropsychologist, like Dr. Bender, and a clinical psychologist both have foundational graduate level training in clinical psychology. (Tp. 228) From there, Dr. Bender went on to specialize in neuropsychology, which has an emphasis on brain-behavior relationships and psychological testing to measure and assess different kinds of brain and cognitive functions. (Tp. 228) Clinical psychology, on the other hand, involves specialization in forensic psychology instead of neuropsychology. (Tp. 228) There is an emphasis on answering questions that attorneys and courts have about a person's behavior or functioning measures up against a legal standard, such as an insanity defense. (Tp. 228) Dr. Kelley explained that her specialization within forensic psychology has been on interrogation-related issues, such as Miranda rights comprehension. (Tp. 228)

Defense counsel asked Dr. Kelley to interview and conduct an evaluation of Defendant regarding suggestability and vulnerability to coercion during police questioning. (Tp. 227) In connection with her evaluation of Defendant, Dr. Kelley was given the following: Defendant's interrogation transcript (Gov. Ex. #1A) and video (Gov. Ex. #1), the Bill of Indictment, police reports, pretrial services report, Defendant's medical records, Social Security records, and some of Defendant's early educational records. (Tp. 229) Dr. Kelley reviewed the interrogation video. (Gov. Ex. #1) (Tp. 229) Dr. Kelley explained that

she consulted with Dr. Bender in preparation for her testimony, and she was familiar with Dr. Bender's findings.  (Tp. 229)

Dr. Kelley interviewed Defendant for a lengthy period of time on December 1, 2017. (Tp. 248, 255)  Defendant stated that he had an overall happy life as a child.  (Tp. 248) Defendant became frustrated in school because he believed the material was redundant. (Tp. 248)  Defendant received passing grades in school until the year he dropped out.  (Tp. 248-249)

Educationally, Defendant obtained his general equivalency diploma (GED).  (Tp. 249)  Defendant also completed Army basic and advanced training.  (Tp. 249)  Defendant served in Vietnam.  (Tp. 249)  Defendant had an appropriate emotional response to his memories of warfare, and he explained that is why he suffers from PTSD.  (Tp. 249) Defendant lived and worked in Florida for the next 17 years.  (Tp. 250)

Defendant had an accident where he lost four fingers on his left hand.  (Tp. 250) Defendant continued to work, but he did so more sporadically because of his medical issues. (Tp. 250)  Defendant admitted he was an alcoholic who formerly consumed a fifth of liquor every two days.   (Tp. 250)   Defendant has maintained his sobriety for approximately 20 years, which shows a certain mental fortitude. (Tp. 250-251.) Defendant has no illegal drug use other than a little bit of marijuana a couple of times while he was in the Army.  (Tp. 251)

Other than his PTSD experiences and seeking treatment for that, Defendant had no prior mental health history.  (Tp. 252)  Nothing Dr. Kelley saw indicated that Defendant

44

had any history of delusions or hallucinations or suicidal ideations or anything of that nature. (Tp. 252)  Defendant did <u>demonstrate</u> some difficulties with attention. (Tp. 252)  Defendant's statements to Dr. Kelley were generally clear and coherent. (Tp. 253)

Dr. Kelley concluded that Defendant was competent to go forward with the proceedings. (Tp. 253-254)  Dr. Kelley believes Defendant understands the criminal charges that are against him. (Tp. 254)  Defendant knows the roles of all the personnel present in the courtroom for his evidentiary hearing. (Tp. 254)  Defendant understands the difference between felonies and misdemeanors. (Tp. 254)  Defendant understands the distinction between a suppression hearing and a trial. (Tp. 254)  Defendant is able to reasonably consider different types of evidence for and against him. (Tp. 254)

When interviewed by Dr. Kelley, Defendant remembered his interrogation. (Tp. 255)  Defendant specifically remembered that one of the interviewers left the room during the interrogation. (Tp. 255)  Defendant recalled that the interview lasted all day. (Tp. 255)  Defendant also mentioned two prior interviews with law enforcement.   (Tp. 256)  Defendant did not recall being nervous during those prior interviews.   (Tp. 256)  Defendant's previous police encounters were non-deadly and non-violent. (Tp. 268)

Defendant stated he felt a duty to tell everything he knew to the police. (Tp. 256)  Defendant said he did not think he needed an attorney. (Tp. 257)  The prior police encounters were not described by Defendant as overly distressing or anything like that. (Tp. 257) Defendant was not shot or roughed up in the prior encounters. (Tp. 257)

45

Dr. Kelley explained what a suggestability and vulnerability evaluation entails. (Tp. 229) Part of it is record review, with the most relevant records being the recording of the interrogation and the interrogation transcript. (Tp. 229-230) The background records, such as the medical records, Social Security, and educational records, provide information on an individual's overall functioning. (Tp. 230) The second component is meeting with the individual and doing a clinical interview, which includes the individual's recollection of the interrogation. (Tp. 230) The final component is the psychological testing. (Tp. 230) The primary test with bearing on this type of question is the Gudjonsoon Suggestability Scales ("GSS"). (Tp. 230)

As far as cognitive testing, Dr. Kelley relied on Dr. Bender's results. (Tp. 230-231) Dr. Kelley gave Defendant the Personality Assessment Inventory ("PAI"), which is a broadband psychological instrument that looks at a variety of mental health symptoms. (Tp. 231) It is used for mental health and personality. (Tp. 231) The PAI has a number of validity skills to assess how a person approaches the testing, which shows whether they were attentive to the items on the test. (Tp. 231) One of the skills is an inconsistency scale, and it assesses whether somebody responds to items with similar content in a consistent way across the test. (Tp. 231-32, 258) The PAI is a lengthy test with 344 items on it. (Tp. 232)

When Defendant's PAI was scored, it became apparent that he had not answered pairs of items in consistent ways, which raised concerns about his comprehension, potential attention problems, or carelessness in the test. (Tp. 232) Defendant's PAI could not be

interpreted because it is not clear how well he comprehended and attended to the items. (Tp. 232, 258)

Dr. Kelley also gave Defendant the GSS, a standard psychological test that is accepted in the field of psychology. (Tp. 232, 246-47, 261) The GSS is designed to assess interrogative suggestibility, which refers to the tendency to give in to leading questions or to shift answers to questions in response to negative feedback. (Tp. 233) The GSS works by first presenting the person with a story that they are asked to remember. (Tp. 233) Their memory of the story is assessed both immediately after hearing the story and after a delay. (Tp. 233) After the delay and hearing their recollection of the story a second time, they're asked a series of questions, the majority of which are leading questions, which involve kind of a forced choice scenario where neither of the options is correct or involve a premise that a person might give into if they are suggestible. (Tp. 233)

After going through these 20 questions, the person is given negative feedback and told they did not perform well, regardless of how they performed. (Tp. 233) They are told they are going to go through the questions a second time and on the second try, they should be more accurate. (Tp. 234) Dr. Kelley stated an examiner would be able to tell at the end of the test the extent to which a person gives into leading questions. (Tp. 234) It also assesses the extent to which they change their answers in response to the negative feedback. (Tp. 234) If there is a distinct change after the negative feedback, it is referred to as a shift on the GSS. (Tp. 234) The second piece to the test is a compliance scale. (Tp. 234) Defendant responded to the compliance scale, as well as his daughter. (Tp. 234)

The test revealed that Defendant's memory is very poor, which is consistent with Dr. Bender's testing. (Tp. 235) In terms of suggestability, Defendant scored just one standard deviation above average. (Tp. 235, 246) Defendant exhibited a greater tendency after he got the negative feedback. (Tp. 236) Defendant's tendency to give in to the leading questions was higher the second time. (Tp. 236) Defendant also exhibited an above average tendency to shift his answers. (Tp. 236) Defendant's responses, as well as his daughter's responses about him on the compliance scale, were similar. (Tp. 236) Defendant's test results showed a higher than usual tendency to comply and acquiesce, especially with authority figures. (Tp. 236)

The first part of Defendant's interrogation was characterized by the presence of multiple situational risk factors. (Tp. 237) The risk factors were risk of yielding or giving in to police questioning, either coming to kind of internally accept somebody else's narrative of events instead of your own. (Tp. 237) Dr. Kelley stated that she observed the following situational risk factors in the interrogation of Defendant: length of the interrogation, repeated rejection of Defendant's denials of the allegations, the officers repeatedly and insistently conveyed that Defendant needed to provide them with information, and the forced choice scenarios that the officers presented Defendant with. (Tp. 238)

The forced choice scenarios refers to the officers repeatedly presenting Defendant with two options with the presumption that one of them must be true and that these are the only two possible alternatives. (Tp. 238) The alternatives that the officers presented

Defendant with were either that he is a pedophile, rapist, or monster or that he more understandably only had contact with the victim's genitals. (Tp. 238-239) Dr. Kelley testified this presentation meant to Defendant that one of those must be true, and the natural tendency there, especially in combination with the some of the situational risk factors, is to agree with the lesser of the two evils; that is, to agree with the allegations that are more minor. (Tp. 239)

The length of the interrogation was another situational risk factor. (Tp. 239) The interrogation lasted about five hours. (Tp. 239) The questioning was not continuous, and there were some breaks. (Tp. 239) Defendant was, however, in police custody for over five continuous hours. (Tp. 239) That length of time is unusual, as most interrogations are 30 minutes to two hours. (Tp. 239) Police interrogation manuals and trainings often caution officers against having lengthy interrogations, in part because they convey to the person that the interrogation is not going to end until the officers are satisfied. (Tp. 239) They are isolated from family members and loved ones. (Tp. 240)

For Defendant, the social isolation entailed the separation from his daughters. (Tp. 240) Defendant's daughters are his primary source of social support and the people he was trying to communicate with during the interrogation. (Tp. 240)

There were repeated rejections of Defendant's denials. (Tp. 241) Defendant denied the allegations for some time. (Tp. 241) The rejections showed Defendant the kind of information that the officers wanted to hear. (Tp. 241)

Dr. Kelley found Defendant has a tendency and history of compliance. (Tp. 243) Defendant reported that he sees a duty to speak with officers when they have questions for him. (Tp. 243) It would not be within Defendant's personal style to get up and march out of police questioning. (Tp. 243) Defendant's daughter stated that Defendant is really just a non-confrontational person. (Tp. 243-244)

Defendant's poor memory, as discussed by Dr. Bender, makes him more vulnerable. (Tp. 244) It is also common in older individuals with memory deficits like Defendant to have trouble discerning where they learned information. (Tp. 245)

Defendant stated to Dr. Kelley that on July 26, 2017, he was not perfectly clear about the topic for discussion. (Tp. 266) Defendant was informed of the allegations against him after he arrived. (Tp. 266-267) Defendant stated the interview went all day or about six hours. (Tp. 267) Defendant said he was scared the law enforcement officers were going to shoot him. (Tp. 267)

At the end of Defendant's questioning, he wrote a written statement and relied on Detective Velez to tell Defendant what he had said. (Tp. 245) Dr. Kelley opined that Defendant's overall memory seemed worse at the end of the interrogation than it did at the beginning. (Tp. 246) For instance, Defendant could not remember basic information like his phone number that he was able to remember at the beginning of the interrogation. (Tp. 246) Defendant also seemed to have poor memory for the specific details that he did admit to earlier in the interrogation. (Tp. 246) Defendant seemed more willing to have the police offer a statement on his behalf and then sign it. (Tp. 246)

50

Dr. Kelley opined that the interrogation strategies used on Defendant were problematic, but not solely because of his vulnerabilities. (Tp. 269) When asked whether he had done this or not, Defendant admitted he just gave in. (Tp. 269)

Dr. Kelley opined that the individual factors may have made Defendant more vulnerable to strategies than the average adult. (Tp. 270) The individual factors in combination with these other situational risk factors certainly operated to make Defendant more vulnerable. (Tp. 270-271)

### c(i)- Dr. Kelley's Report

The report of Dr. Sharon Kelley was introduced into evidence as Defendant's Exhibit 3. In her report, Dr. Kelley concludes as follows:

> Lonnie Armachain is a 70-year-old man charged with three counts of Aggravated Sexual Abuse and three counts of Abusive Sexual Contact in the United States District Court for the Western District of North Carolina. Mr. Armachain has a history of PTSD (related to his deployment during the Vietnam War) and depression, with a more recent history of cognitive decline. According to Dr. Bender, Mr. Armachain likely meets criteria for major neurocognitive disorder.

> The current evaluation addressed Mr. Armachain's suggestibility and vulnerability to coercion during police questioning. Interview and testing with Mr. Armachain, and review of the transcript and recording of Mr. Armachain's interview with police, revealed both situational and individual risk factors during the police interview. In brief, these factors involved a lengthy interview in which officers repeatedly characterized Mr. Armachain's only choice as either being labeled a "monster" or admitting to contact with the victim's genitals. Lengthy interviews that include repeated rejections of one's denials; forced choice questions in which the illegality of a behavior is minimized in comparison to some other, worse behavior; and repeated requests or statements that the suspect must tell interrogators something can elicit natural tendencies to remove oneself from an aversive, stressful situation. In the context of police interrogations, this often takes the

form of admitting to the allegations, as it did in Mr. Armachain's case. Finally, Mr. Armachain's individual vulnerabilities, namely suggestibility and compliance---as demonstrated on psychological testing and suggested from prior encounters with police---and memory deficits may have made him particularly vulnerable to these strategies.

## III. DISCUSSION

Defendant argues that his Fifth Amendment rights were violated when officers coercively exploited his vulnerable condition in order to extract a confession on July 26, 2017. Mot. Supp. (# 15) at 1. Defendant contends that, under the totality of the circumstances, his incriminating statements were involuntary, and his Miranda waivers were invalid. Id. Defendant further argues that the officers' failure to re-advise him of his Miranda rights when he was first subjected to custodial interrogation also constituted a violation of his Fifth Amendment rights. Id. Defendant concludes that the Court should suppress all of his statements because they were made in violation of his Fifth Amendment rights. Id. at 17.

### A. Defendant was in custody on July 26, 2017.

The Government argues that Defendant was not in custody during the July 26, 2017, interview. Resp. (# 23) at 2-4. Citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 1990), the Government argues when a defendant is repeatedly told that he is free to terminate an interview, it is powerful evidence that a reasonable person would have understood that he was free to end the interview. Id. at 3. As addressed below, under Fourth Circuit precedent, when a defendant is told that he is free to terminate an interview, it serves as some evidence that he is not "in custody," but the court must look to the "totality of the circumstances."

"[L]aw enforcement [must] inform individuals who are in custody of their Fifth Amendment rights prior to interrogation . . . Without a <u>Miranda</u> warning,[2] evidence obtained from the interrogation is generally inadmissible." <u>United States v. Parry</u>, ___ F. App'x ___ , 2018 WL 985792, at *1 (4th Cir. 2018) (per curiam) (quoting <u>United States v. Hashmine</u>, 734 F.3d 278, 282 (4th Cir. 2013) (citations omitted)); <u>see United States v. Wiggins</u>, 708 F. App'x 105, 108 (4th Cir. 2017) (recognizing that there is no Fifth Amendment violation where the circumstances demonstrate that a person "would have felt free to terminate the police questioning"). To determine whether a defendant not under formal arrest was "in custody," the court must assess "whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest." <u>Id.</u> at 107 (quoting <u>Hashmine</u>, 734 F.3d at 282 (brackets and internal quotation marks omitted)). In making this determination, the court must look to several factors, which include the following:  (1) the time, place, and purpose of the encounter; (2) the words used by the officer; (3) the officer's tone of voice and general demeanor; (4) the presence of multiple officers; (5) the potential display of a weapon by an officer; (6) whether there was physical contact between the defendant and the officer; and (7) the suspect's isolation and separation from family and physical restrictions.  <u>Id.</u> at 107-08 (quoting <u>Hashime</u>, 734 F.3d at 282).

---

[2] In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court "adopted prophylactic procedural rules that must be followed during custodial interrogations." <u>Burket v. Angelone</u>, 208 F.3d 172, 196 (4th Cir. 2000).  <u>Miranda</u> warnings are "not themselves rights protected by the Constitution, but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." <u>Michigan v. Tucker</u>, 417 U.S. 433, 444 (1974).

In the instant case, under the first factor, the time, place, and purpose of the encounter, Detective Velez initiated contact with Defendant by calling him on the telephone. (Tp. 15)  According to Detective Velez, Defendant and Velez agreed to meet at the Police Department at 1:00 o'clock p.m. on July 26, 2017.  (Tp. 15)  Upon Defendant's arrival at the Police Department, Defendant walked with Velez to the back of the Police Department into a small interview room. (Gov. Ex. #1) (Tp. 16-17, 19, 39.)  The inner portion of the Police Department, where Defendant was taken, was <u>locked</u>.  (Tp. 18-19, 38.) Moreover, the door to the interview room where Defendant was taken was <u>shut</u>.  (Gov. Ex. #1)Mot. Suppress. (# 15-2) at 11.  <u>Cf</u>. <u>United States v. Sullivan</u>, 138 F.3d 126, 132 (4th Cir. 1998) (noting that detaining the defendant at midday on the side of a highway in full public view weighed in favor of finding that he was not "in custody" for Fifth Amendment purposes).

At the beginning of the interview, Detective Velez told Defendant that he was not under arrest, he was free to leave, and the door to the interview room door was not locked. (Tp. 39.)  <u>See</u> <u>United States v. Hargrove</u>, 625 F.3d 170, 180 (4th Cir. 2010) (A statement that an interviewee is free to leave is not dispositive to show a lack of custody, but it weighs in favor of a finding that he is not in custody). During the course of the interview that lasted more than five hours, Detective Velez did not, again, tell Defendant he was free to leave. (Tp. 40)  <u>Cf</u>. <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (finding that a half-hour interview at the police station where the defendant was advised he was not under arrest failed to constitute a custodial interrogation).  However, despite being told he was free to

leave by both Velez and Aldridge the facts show these statements by the officers were not true. On five (5) separate occasions Defendant asked not to leave, but just for permission to talk to his daughters. Defendant's requests were either ignored or denied. (Gov. Ex. #1; 14:39:30; 14:51:29; 15:09:20; 15:13:10; 15:14:10) Defendant was also told that if he confessed he would be allowed to leave which was a false statement. (Int. p. 105-106) For those reasons, the Court finds a reasonable person would not have felt free to leave. The first factor is weighed in favor of Defendant.

Under the second factor, the Court must look at the words used by officers. When Detective Velez sat down with Defendant, he told Defendant they were investigating a crime against victims, the names of the victims, and that the crime was sexual in nature. (Tp. 20-21.) See United States v. Jayyousi, 657 F.3d 1085, 1110 (11th Cir. 2011) (finding that an objective person would have not felt free to leave after having been accused of illegal activities). Detective Jenkins made a series of coercive accusations against Defendant, all the while telling Defendant that his denials were untrue. (Gov. Ex. #1, 13:41:24-13:52:00) This occurred while Jenkins, who was armed, was seated within one to two feet of Defendant, which barred any possible attempt Defendant could or might have made to leave. (Gov. Ex. #1, 13:41:24-13:52:00)

Furthermore, Investigator Aldridge pressured Defendant by informing him that he was facing a lengthy prison sentence if he did not cooperate. (Tp. 82.) In particular, Investigator Aldridge told Defendant that talking to Aldridge was all about Defendant helping himself, as Defendant was looking at a potential 20-year sentence. (Tp. 82) In

sum, the words used by the officers weigh in favor of a belief that Defendant was not free to leave. Therefore, the second factor is weighed in favor of Defendant.

As for the third factor, the officers' tone of voice and general demeanor, the Court notes that the tone of voice used by Jenkins in his accusations against Defendant was particularly harsh. His rapid-fire questions, without giving Defendant hardly any opportunity to answer, and then rejecting any answer that was provided by Defendant, would indicate to any reasonable person that they were in custody. The Court further notes that when Defendant asked for a bathroom break, Investigator Aldridge testified that he took Defendant out of the interrogation room, showed him to the restroom, and waited in the hallway to make sure Defendant would find his way back. (Tp. 59) A reasonable person under these circumstances would have felt like they were being escorted because they were in custody. See United States v. Colonna, 511 F.3d 431, 436 (4th Cir. 2007) (finding that the defendant was in custody where he was subjected to a three-hour interview and was guarded by law enforcement when he smoked cigarettes). On the five (5) occasions that Defendant asked to talk to his daughters he was only allowed to do so on the fifth occasion; thus, the third factor is weighed in favor of Defendant.

Under the fourth factor, the presence of multiple officers, it is undisputed that Detective Velez, Investigator Aldridge, and Detective Jenkins were each involved in Defendant's interrogation. See (Gov. Ex. #1) Detective Velez thought that he and Detective Jenkins were in the first interview room with Defendant at the same time. (Tp. 31) The presence of more than one officer, in what was described as "a not very big"

56

interview room (Tp. 19, 39), weighs in favor of Defendant. The fourth factor is weighed in favor of Defendant.

With respect to the fifth factor, the potential display of a weapon by an officer, Detective Velez could not recall if he, Detective Jenkins, or Investigator Aldridge were wearing a firearm when they met with Defendant. (Tp. 27-28, 38.) Investigator Aldridge testified that he was not wearing a firearm during Defendant's interview. (Tp. 59) Detective Jenkins' testified he could not recall if he was wearing a handgun during Defendant's interview. (Tp. 99) However, after an examination of Government's Exhibit #1, any person can easily see Jenkins' pistol and other equipment, including handcuffs, on his waist and can easily determine that Jenkins was armed. Detective Jenkins, however, does not appear to use the firearm in any sort of threatening manner toward Defendant, but but Defendant is seen staring directly at the firearm. (Tp. 99) The fifth factor is weighed in favor of Defendant.

Pursuant to the sixth factor, whether there was physical contact between Defendant and the officers, there is no evidence before the Court that Detective Velez, Investigator Aldridge, or Detective Jenkins came into actual contact with Defendant. (Gov. Ex. #1) On the other hand, Government's Exhibit #1 shows Jenkins changing his seating position during the interrogation of Defendant until he is seated only one to two feet from Defendant's face while using a loud voice to make accusations of criminal conduct against Defendant. Jenkins further takes his finger and places it close to Defendant's face. The Court find the sixth factor is weighed in favor of Defendant.

Under the seventh factor, the suspect's isolation and separation from family and physical restrictions, Defendant's daughters were left in the lobby while Defendant went back behind a locked door for an interrogation. Five (5) times Defendant requested to speak to his daughters, and only after he had given an inculpatory statement was Defendant allowed to do so. (Gov. Ex. #1)

The Government argues that Defendant's requests to speak with his daughters were allowed, but merely "deferred until a later time." Resp. (# 23) at 3. The evidence contained in Government's Exhibit #1 shows that this contention is not accurate. In the Court's opinion, Defendant was prevented from going to speak to his daughters, as he requested and, if he was a person who was not actually in custody, he would have been allowed to do so. The refusal occurred on four (4) separate occasions. Only on the fifth occasion was Defendant allowed to speak to his daughters, who it appears were actually his caregivers. In sum, Defendant's isolation and separation from his daughters weighs in favor of a finding that a reasonable person would have felt they were not free to leave. Consequently, the seventh factor is weighed heavily in favor of Defendant.

In sum, there are more factors weighing in favor of a finding that Defendant was "in custody." Therefore, the Court concludes that, under the totality of the circumstances, a reasonable person would have felt that their freedom of action was curtailed to the degree associated with formal arrest. See Parry, 2018 WL 985792, at *1. Because Defendant was "in custody," he was entitled to Miranda warnings.

**B.** **Officers elicited statements from Defendant in violation of the Fifth Amendment because Defendant's statements were not voluntary.**

The Self-Incrimination Clause of the Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; United States v. Nielsen, 640 F. App'x 224, 227 (4th Cir. 2016). To protect this right, when a suspect is subject to a "custodial interrogation," he must be warned that "he has a right to remain silent, and that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). As a general proposition, evidence seized from a custodial interrogation without the proper Miranda warnings will be inadmissible in the prosecution's case-in-chief. United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001). The privilege against self-incrimination "is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" Miranda, 384 U.S. at 460 (quoting Malloy v. Hogan, 378 U.S. 1, 8 (1964)).

Defendant signed two Miranda rights waiver forms (see Tp. Gov. Ex. 2; Feb. 20, 2018 Hr'g Tr. at 57), but this Court must still evaluate the "voluntariness" of Defendant's statements to law enforcement on July 26, 2017. See Dickerson v. United States, 530 U.S. 428, 444 (2000) (holding that the voluntariness determination focuses on "whether a defendant's will was overborne by circumstances surrounding the giving of a confession.") (quotation omitted)). A statement is deemed involuntary under the Fifth Amendment only when it is involuntary within the meaning of the Due Process Clause. United States v.

Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc).  When evaluating the voluntariness of a statement under the Due Process Clause, the court must determine whether the confession was the result of threats or violence, or obtained through direct or implied promises, or by the exertion of improper influence.  United States v. Byers, 649 F.3d 197, 215 (4th Cir. 2011).  Coercive police activity, such as threats, violence, implied promises, or improper influence does not automatically render a confession involuntary.  Braxton, 112 F.3d at 781.

The proper determination "is whether the defendant's will has been 'overborne' or his capacity for self-determination critically impaired.'"  United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).  For a confession or a Miranda waiver to be considered involuntary, there must be a finding of coercive police activity.  United States v. Giddins, 858 F.3d 870, 881 (4th Cir. 2017).  A court must consider the totality of the circumstances, which includes the "characteristics of the defendant, the setting of the interview, and the details of the interrogation."  Pelton, 835 F.2d at 1071; see Culombe v. Connecticut, 367 U.S. 568 (1961) (holding that a confession must be voluntary, not coerced, as determined by the "totality of the circumstances").  "The Government bears the burden of proving by a preponderance of the evidence that the statement was voluntary."  Giddins, 858 F.3d at 881 (quoting Braxton, 112 F.3d at 781 (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)).

In the instant case, Defendant was asked to come to the Police Department to meet with Officer Velez.  (Tp. 15)  Upon arrival, Defendant was first taken behind a locked door

60

into a small interview room and was then taken to a second interview room with a closed door. (Tp. 19, 38-39; Mot. Suppress (# 15-2) at 11) Detective Velez advised Defendant that law enforcement officers were investigating a sexual crime against child victims and the names of the victims. (Tp. 20-21.) Government's Exhibit #1 shows clearly that Detective Jenkins was armed during the interrogation. (Gov. Ex. #1) This fact is contrary to the sworn testimony of Velez, Jenkins and Aldridge. (Tp. 27, 28, 59, 99) The July 26th interview, which Detective Jenkins and Inspector Aldridge conceded turned into an interrogation, lasted over five (5) hours. (Tp. 80, 104) Defendant was prevented from going to speak to his daughters in the police department lobby on four (4) occasions and only on the fifth request was he permitted to do so. (Tp. 61, 86-88)(Gov. Ex. #1) Defendant was told he would be able to go home at the end of the day, which was not true. (Tp. 35-36, 91-92) Defendant was not provided with counsel for the interrogation. (Gov. Ex. #1)T

The record before the Court strongly suggests that Defendant is cognitively impaired. See Sims v. Georgia, 389 U.S. 404, 407 (1967) (concluding that the defendant's confession was involuntary where he had a limited mental capacity and lacked access to family, friends, and counsel during continuous police custody for over eight hours without food). A review of the transcript and video from Defendant's July 26, 2017, interrogation reveals that he was unable to recall obvious details. For example, Defendant thought the current year was 2016. Mot. Suppress (# 15-2) Ex. D at 4. At the end of the interrogation Defendant could not even recall any portion of his phone number. Id. at 107. Finally, Defendant repeatedly asked Detective Velez to assist with his statement by writing it down

for him. ( Tp. 108, 110-11)  Defendant asked Velez how to spell simple words, such as "kiss" and "remove". (Int. p. 170, 175, 181)

The conclusion that Defendant is cognitively impaired finds further support from the opinions offered by the neuropsychology and clinical psychology experts who testified at the February 20, 2018, evidentiary hearing.  Dr. Bender, an expert in neuropsychology, opined that Plaintiff suffers primarily with a major neurocognitive disorder.  (Tp. 202)(Def. Ex. #2)  Dr. Bender further opined that what he saw in Defendant was reflective of Alzheimer's disease.[3]  (Tp.  198, 206)  Dr. Bender explained that the presence of a neurocognitive disorder is significant because individuals with Alzheimer's or neurocognitive disorders are generally more vulnerable.  (Tp. 211)  Dr. Kelley, an expert in clinical psychology, opined that Defendant's memory is very poor, which she noted was consistent with Dr. Bender's findings.  (Tp. 245)  Dr. Kelley noted that it is common in older individuals with memory deficits, such as Defendant, to have trouble discerning where they learned information.  (Tp. 245)  Dr. Kelley also noted that at the end of the interrogation, when Defendant attempted to write a written statement, he relied on Detective Velez to tell him what to write.  (Tp. 245)

In Miranda, the Supreme Court, again, recognized that "coercion can be mental as well as physical."  384 U.S. at 448.  In the instant case, the officers exploited Defendant's weakened mental state by employing psychological tactics.  For example, it is undisputed

---

[3] Dr. Bender explained that the only way to definitively diagnose Alzheimer's disease is through an autopsy.  (Tp.  206)

that the interrogation lasted five hours and 11 minutes. (Tp. 184) Defendant was separated from his daughters and not allowed to go to them when he requested to do so on at least five (5) occasions. (Gov. Ex. #1)

During multiple reviews of Government's Exhibit #1, the Court notes the following circumstances, facts and events concerning the interrogation of Defendant, which support the Court's conclusion that the statement given by Defendant was coerced and made only after his will was overborn:

- Five times Defendant states that he wishes to speak to his daughters, who provided care for him, and only after he gave a statement was he allowed to do so. (14:39:40) (14:51:29) (15:09:20) (15:12:34) (15:13:00) (15:14:10)

- Defendant was not allowed to talk to his daughters because that conversation might have precluded a confession being obtained from Defendant. (Tp. 61-62)

- Detective Jenkins testified he had nothing to do with the investigation, but he was the officer who called for Investigator Aldridge to travel from Asheville, North Carolina, to Cherokee, North Carolina, to conduct the polygraph examination of Defendant (Tp. 53-54) and it was Detective Jenkins who accused Defendant of raping two children, (Int. p. 44-47) despite the fact that Jenkins testified that at no time had he reviewed the interviews of the alleged victims.

63

- Detective Velez, (Tp. 28-29) Detective Jenkins, (Tp. 99) and Investigator Aldridge (Tp. 84-85) all testified Defendant was clear headed, focused and attentive; however, after repeated examinations of Government's Exhibit #1 by the Court, the Court is of the opinion that any reasonable person, with experience dealing with the public, would have and should have quickly determined Defendant had significant cognitive difficulties.

- Investigator Aldridge's statement to Defendant stating if Defendant would confess he would be allowed to leave was false. (Int. p. 105-106) Velez and Jenkins agreed to do so, but Velez issued warrants for Defendant and arrested him. (14:54:01) (Int. p. 108) (Tp. 100)

- Investigator Aldridge's statements to Defendant that he would receive a twenty (20) year sentence, which would be a life imprisonment, unless he "helped himself" and allowed Officers Velez and Jenkins to help him. (Int. p. 103-115)

- The allegations to Defendant by Detective Jenkins that two (2) children were raped (Int. p. 44-47) as compared to Investigator Aldridge's allegations of improper touching of one child. (Int. p. 96)

- The five (5) hour length of the interrogation.

- Defendant being interrogated by teams of officers, either one or two, and at one point by three officers.

- The successful effort of Detective Jenkins to "bait" Defendant into agreeing to take the lie detector or polygraph test. (13:41:24-13:52:00)

- The cognitive and mental difficulties of Defendant, as testified to by Defendant's expert witnesses, Dr. Leo, Dr. Bender and Dr. Kelley, as compared to the officers' statements that Defendant was totally in control of his mental faculties.

- The vigorous and intensive interrogation of Defendant by Detective Jenkins. (13:41:24-13:52:00)

- The statement of Defendant to Investigator Aldridge that he was being required to take the lie detector against his will by Detective Jenkins and Investigator Aldridge not making further inquiries about this issue. (Int. p. 68)

- Detective Velez dictating to Defendant what he should write in his statement. (Int. p. 165-181) (16:32:00-17:07:13)

- Defendant requesting Velez to write the statement for him. (Int. p. 167-169)

- The interrogation takes place in the Cherokee Police Department behind locked doors.

In sum, based on the totality of the circumstances, the Court finds Defendant's will was "overborne" by the actions of Detective Velez, Detective Jenkins and Investigator Aldridge. See United States v. Wertz, 625 F.2d 1128, 1133-34 (4th Cir. 1980) ("Whether a confession is involuntary . . . is a question of fact to be determined from the totality of

65

the circumstances both the characteristics of the accused and the details of the interrogation.") (internal quotation omitted). In any event, it is further clear that the Government has not fulfilled its burden of proving, by a preponderance of the evidence, that Defendant's statements were voluntary. Consequently, the Court concludes that Defendant's statements were involuntary.[4]

The undersigned does not take the recommendation contained herein lightly. That having been said, when the evidence before this Court was viewed through the lens of Fourth Circuit and Supreme Court precedent, this recommendation was the only result.

## IV.    Conclusion

In light of the foregoing, it is RECOMMENDED that Defendant's Motion to Suppress Statements (# 15) be GRANTED, and the presiding District Judge enter an order suppressing Defendant's July 26, 2017, statements, which were made in violation of his Fifth Amendment rights.

Signed: September 11, 2018

Dennis L. Howell
United States Magistrate Judge

---

[4] Having determined that Defendant is entitled to the relief he seeks on his first assignment of error, the Court has not addressed Defendant's remaining assignments of error.

**Time for Objections**

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within fourteen (14) days of service of same. Responses to the objections must be filed within fourteen (14) days of service of the objections. Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).